UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

SHARONIA BARTON,

                Plaintiff,

v.

                Case # 14-CV-6658-FPG-JWF

                DECISION AND ORDER

UNITY HEALTH SYSTEM,

                Defendant.
_____

## INTRODUCTION

Plaintiff Sharonia Barton brings this discrimination action against her former employer, Defendant Unity Health System, alleging disparate treatment, hostile work environment, and unlawful retaliation under 42 U.S.C. § 1981 ("Section 1981"), Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with Disabilities Act of 1990 ("ADA"), and the New York State Human Rights Law ("NYSHRL"). Defendant has moved for summary judgement on all claims. ECF No. 50. For the reasons stated below, Defendant's Motion for Summary Judgment is GRANTED in full.

## BACKGROUND[1]

Plaintiff is an African American female who worked full-time as a dental hygienist for Defendant beginning in November 2002. She worked at Defendant's St. Mary's Campus in Rochester, New York, which provides low-income individuals with dental care. Defendant also maintains clinics in Greece and Penfield and a mobile unit, and the four locations together serve 45,000 patients annually.

---

[1] [1] The following facts are undisputed and are taken from each party's Statement of Material Facts (ECF Nos. 50-1, 55-1) unless otherwise noted.

Plaintiff was diagnosed with carpal tunnel syndrome on November 11, 2010. In May of 2011, Plaintiff took medical leave from work for corrective surgery. During her leave, Laurel Tschetter became the office manager of the St. Mary's Campus. Shortly after Plaintiff returned to work in July 2011, dental hygienist Patrizia Farsace joined the St. Mary's Campus. Plaintiff immediately took offense to Farsace, who allegedly asked Plaintiff questions like "I thought that blacks had hair like wool?" and "can blacks grow hair?" Farsace also told Plaintiff that she was not prejudiced against black people but that her husband was and would never invite a black person over for dinner. Plaintiff complains that Farsace, who had approximately one year of work experience at Unity compared to Plaintiff's ten years with Unity, received a higher salary than Plaintiff. But Unity bases salaries on overall work experience and not just work experience with the company, and Farsace had seven more years of overall work experience than Plaintiff. *See* ECF No. 58-3 at 16-18.

Plaintiff immediately reported Farsace's comments to her supervisor Tschetter. Plaintiff alleges that Tschetter told her she did not believe Plaintiff, but then ultimately told her she would "handle it." ECF No. 56-1 at 103. Plaintiff also claims that Tschetter subsequently started ignoring Plaintiff and treating her poorly.[2] But the record belies Plaintiff's claim: Tschetter emailed Plaintiff and her coworkers in October 2011 to thank them for lunch and a gift card, and Ms. Barton responded that Tschetter was welcome and "deserve[d] it and much more! :)"[3] Plaintiff did not report any additional incidents of harassment until May 2012, when Farsace allegedly asked whether Plaintiff brought macaroni and cheese to a work function. Plaintiff perceived the comment to be racial, and was also upset when Farsace asked her on the one-year anniversary of

---

[2] Plaintiff claimed at deposition that Tschetter took her desk away, refused to order her a sign, stopped inviting her to lunch, and scolded her in meetings and in front of patients.

[3] Plaintiff claimed at deposition when presented with this document that she did not write this email, suggesting that "maybe [she] didn't log out on the computer and someone got in" to fabricate this email. *See* ECF No. 55-1 at 6.

2

her carpal tunnel surgery if she was happy. Later that month, Tschetter gave Plaintiff her 2011 performance review, which was positive[4] but contained constructive criticism such as "[Plaintiff] can sometimes become defensive and gives the perception that she is unwilling to look at any alternatives to improve the situation" and "[Plaintiff] needs to keep any negative comments about other physicians to herself when she is with or around patients." ECF No. 50-2 at 111. Plaintiff construed these criticisms as false accusations.

Bothered by the review and other issues, Plaintiff took a medical leave of absence beginning on May 14, 2012 for work-related stress. ECF No. 50-2 at 80. She had previously taken leave for work-related stress from January 27 to February 6, 2012. In May 2012, while she was on leave, Plaintiff visited with Sundrina McLendon, Unity's Human Resources Business Partner. She complained about Farsace's racially insensitive comments and about the criticisms in Tschetter's 2011 review. Plaintiff also claimed that Tschetter was ignoring her and favoring Farsace. McLendon, also an African American female, perceived that the "overwhelming majority of [Plaintiff's] complaints" were about "co-worker/supervisor relationship and practice management issues" and not race-based harassment. *Id.* at 81. McLendon set up a meeting with Roberta Jennings, Unity's Senior Director for Practice Management at the time, to "correct any [of Plaintiff's] misperceptions and give [Plaintiff] and her coworkers an opportunity for a fresh start with everyone on the same page." *Id.*

Plaintiff met with Jennings when she returned from medical leave in June 2012. Again, Plaintiff complained that Tschetter favored[5] Farsace over her, and that Farsace was making racially

---

[4] Although the Complaint refers to the 2011 performance review as "poor," *see* ECF No. 1 at 8, Plaintiff received ratings of "successful" for nearly every aspect of her performance. *See* ECF No. 50-2 at 111.

[5] Plaintiff also told Jennings that people in the office were laughing at the size of the cake and card that Tschetter had gotten for her birthday, and that Tschetter, Farsace, and some other dentists had not signed her card. But Tschetter had intentionally purchased a cake that Plaintiff indicated was her favorite, and that cake only came in a smaller size.

3

insensitive comments. Plaintiff also complained that Tschetter gave Farsace time off but refused to give it to her. Farsace had paid time off to spare, however, and Plaintiff did not.

At the end of the meeting, Jennings told Plaintiff that they should meet with Tschetter the following week to work through these issues and discuss Plaintiff's 2011 performance review. That proposed meeting never occurred because Plaintiff again took leave for work-related stress the following Monday, and remained out of work through the end of 2012 and into 2013.

Unity struggled in Plaintiff's absence. Because Plaintiff did not timely inform Tschetter that she had taken leave, a patient arrived for an appointment with Plaintiff and became upset when no one could see her, as the St. Mary's Campus was already short-staffed. Because Plaintiff had provided no timeline for her return to work, the staff at Unity had to keep re-scheduling patients on a day-to-day basis because they were not sure how long Plaintiff would be away. When Tschetter called Plaintiff to ascertain a timeline for her return, Plaintiff stated that her doctor took her out of work indefinitely and that she would be seeing her doctor in "a couple of weeks," and then she hung up on Tschetter.

In July, Jennings recommended that the St. Mary's Campus cancel all of Plaintiff's future appointments because repeatedly canceling and rescheduling them was hard on other hygienists' already overbooked schedules, and it adversely impacted patient service. On July 19, 2012, Unity's Senior Worker's Compensation and Disability Specialist Tiffany Passmore spoke with Plaintiff over the phone, who told Passmore that it may be "a few months" before she could return to work.

On August 8, 2012, Pamela Caggianelli, Unity's Director of Employee Health & Wellness, sent a letter to Plaintiff informing her that her 12 weeks of Family and Medical Leave Act job protection would end on August 14, 2012. Unity then would place Plaintiff on personal medical

leave, though Plaintiff would remain on Unity's payroll at the same benefit status. The letter further informed Plaintiff that she must stay in contact with Unity during the personal leave period so they could assess next steps together.

Also in August, after another dental provider for lower-income individuals lost its grant with the Rochester Primary Care Network ("RCPN"), Unity anticipated an influx of 300 new dental patients at the St. Mary's Campus. Jennings believed that Unity needed to hire a new full-time hygienist to accommodate these prospective patients or else it risked losing its own grant from RCPN for serving low-income individuals. In October 2012, St. Mary's hired a new full-time hygienist.[6] At that time, it was still unclear when or whether Plaintiff would return to work. Weeks later, in November 2012, Plaintiff's insurer approved her for additional short term disability leave through December 2012, and Plaintiff applied for long term disability benefits thereafter.

Finally, in February 2013, Plaintiff sent McLendon a note from her physician stating that she could return to work on March 1, 2013. The note also stated that Plaintiff requested not to work with the same supervisor and hygienist who had caused her stress and extreme anxiety and depression. McLendon searched for another open hygienist position in Unity's other locations, but none were available and creating a new full-time hygienist position would have been prohibitively expensive for Unity. There was, however, an available dental medical secretary position that would allow Plaintiff to work for a different supervisor, maintain her seniority in the company, and evaluate new Unity positions as they opened in the future. However, Plaintiff rejected the secretary position and refused to return to her hygienist job unless Unity replaced or relocated Tschetter and Farsace. Plaintiff gave Unity no choice but to terminate her employment effective March 1, 2013.

---

[6] Plaintiff complains that this new hygienist was Caucasian.

5

Plaintiff filed an administrative charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on June 21, 2012 alleging discrimination based on race and disability, and retaliation. On August 26, 2014, the EEOC dismissed her charge with no finding of discrimination.

**DISCUSSION**

**I.  Legal Standard**

Summary judgment is appropriate if "the pleadings, the discovery and disclosure material on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Sousa v. Roque*, 578 F.3d 164, 169 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56). A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under governing law." *Id*. The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. The court resolves all ambiguities and draws all factual inferences in favor of the nonmovant, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56).

**II.  Race-Based Disparate Treatment Claims Under Title VII, NYSHRL, and Section 1981**

Plaintiff argues that Unity discriminated against her based on her race in violation of Title VII, the NYSHRL, and Section 1981. To establish a *prima facie* case of discrimination under these statutes, a plaintiff must demonstrate that "(1) she belonged to a protected class; (2) she was qualified for the position he held; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of

6

discriminatory intent." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012). If the plaintiff proves her *prima facie* case, the defendant must proffer a legitimate nondiscriminatory reason for the adverse employment action. If he does, the plaintiff must then prove by a preponderance of the evidence that the defendant's articulated nondiscriminatory reason was in fact a pretext for discrimination. *Id.* Ultimately, the plaintiff must prove that discrimination was the "but-for" cause[7] of her termination. *Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).

Defendant concedes that Plaintiff established the first three elements of her *prima facie* burden, but argues that Plaintiff has not shown that it terminated her under circumstances giving rise to an inference of discriminatory intent. Defendant maintains that it did not terminate Plaintiff because of her race, but because she refused the only available position to her after her lengthy and indeterminate leave of absence.

The record soundly supports Defendant's version of events. Emails between Tschetter, Jennings, Passmore, McLendon, and Caggianelli document the difficulties that Defendant faced in Plaintiff's absence and Defendant's need to hire a new hygienist or risk jeopardizing its ability to serve existing and prospective patients. *See* ECF No. 55-5 at 98-101. The record also establishes that Defendant gave Plaintiff the opportunity to maintain her employment with the organization, offering her a position as a dental secretary, and that Plaintiff flatly refused the offer.[8] By refusing to work under her previous supervisor or accept the only available job at Unity, Plaintiff gave Defendant little choice but to terminate her employment. Necessity dictated Defendant's choice—not a desire to discriminate against Plaintiff.

---

[7] The but-for causation standard applies to Title VII, NYSHRL, and Section 1981 cases. *See Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 32 (E.D.N.Y. 2015) (noting that Title VII and NYSHRL claims are analyzed using the same burden-shifting framework); *Brown v. City of Syracuse*, 673 F.3d 141 (2d Cir. 2012) (analyzing Title VII and Section 1981 cases under the same burden-shifting framework).

[8] Plaintiff argues that she was "barely afforded the opportunity to even consider the serious decision of accepting [a] new career [as a secretary]," ECF No. 55-1 at 49, but in fact, Plaintiff had more than two weeks between the phone conversation where she rejected the job offer and the time when Defendant officially confirmed her termination.

7

Plaintiff argues otherwise, asking the Court to infer discriminatory intent from the alleged fact that "Plaintiff was [treated] less favorably" than Farsace who is "a similarly situated employee outside her protected group." ECF No. 55 at 6. The evidence demonstrates, however, that any differential treatment between Plaintiff and Farsace was the result of innocuous, legitimate business decisions. Farsace made more money than Plaintiff, but only because she had several more years of dental hygienist experience. Additionally, Tschetter gave Farsace permission to arrive to work one hour late every Wednesday and Friday and denied Plaintiff's request to take every other Monday off, but Tschetter did so because Farsace had paid time off to spare and Plaintiff did not.

Plaintiff also complains that Tschetter discouraged dental assistants from working with Plaintiff, was rude to her, gave her a bad review, and bragged that she had fired two other employees, both of whom happened to be minorities. But the record casts doubt[9] on the veracity of these complaints and, in any event, Plaintiff never explains how discriminatory intent motivated Tschetter's alleged actions, or how Tschetter's actions related to Defendant's ultimate decision to terminate her.[10] No evidence suggests that Tschetter or any conflict she had with Plaintiff played a role in Plaintiff's termination. Even if it did, Plaintiff has not adduced evidence showing that her supervisors acted with discriminatory intent. Without such a showing, any personality conflict

---

[9] As discussed in the background section of this opinion, Plaintiff sent Tschetter an email praising her during the period in which the two were supposedly ignoring each other and Plaintiff's performance review was not actually poor. Additionally, it is not clear from the record that Tschetter discouraged assistants from helping Plaintiff, or her reasons for doing so if she did. *See* ECF No. 58 at 3. Moreover, the record establishes that Tschetter did not actually fire the employees that Plaintiff supposedly heard her bragging about firing. *See id.*

[10] Plaintiff argues that her termination was an adverse action, which is true, but it is not clear whether Plaintiff is also arguing that Tschetter's alleged actions themselves—such as moving Plaintiff's desk, ignoring her, and giving her bad performance reviews--constituted "adverse employment actions." To the extent that Plaintiff is arguing this, the Court denies that Tschetter's actions constituted adverse employment actions. Only "materially adverse changes" in the terms and conditions of employment, such as terminations, constitute adverse employment actions. *See Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003). Plaintiff's allegations against Tschetter, even if true, do not amount to materially adverse changes in the terms and conditions of her employment.

that Plaintiff had with Tschetter or anyone else at Unity is not the province of Title VII, the NYSHRL, or Section 1981. Defendant's Motion for Summary Judgment is therefore GRANTED with respect to Plaintiff's race-based disparate treatment claims under those laws.

### III. Hostile Work Environment Claims Under Title VII, the NYSHRL, Section 1981, and the ADA

Next, Plaintiff argues that Defendant subjected her to a hostile work environment under Title VII, the NYSHRL, Section 1981, and the ADA. To prevail on a hostile work environment claim, the plaintiff "must make two showings: (1) that the harassment was sufficiently severe or pervasive to alter the conditions of the [plaintiff's] employment and create an abusive working environment and (2) that there is a specific basis for imputing the conduct creating the hostile work environment to the employer." *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009) (internal quotation marks omitted). The employee may demonstrate this specific basis "by showing that the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004) (quoting *Kariban v. Columbia Univ.,* 14 F.3d 773, 780 (2d Cir. 1994)).

Plaintiff cannot make either of the requisite showings. For racist "comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity . . . meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (internal quotations omitted). Additionally, Plaintiff must demonstrate both that she perceived the environment to be abusive and that the environment was "objectively hostile and abusive." *Zamot v. Monroe Cty. Dep't. of Human Servs.*, 739 F. Supp. 2d 311, 321-22 (W.D.N.Y. 2010). Farsace

allegedly directed a handful of offensive[11] remarks and questions to Plaintiff, but they were, at most, a few isolated incidents of racial enmity and not the "steady barrage" that the Second Circuit requires. Plaintiff also claimed at her deposition that Farsace asked Plaintiff if she was happy since it was the anniversary of her carpal tunnel surgery, but that one isolated comment falls far short of creating an abusive working environment.

The Court need not dwell on the first element of proving a hostile work environment because Plaintiff failed to impute Farsace's conduct to Defendant. Defendant maintained a policy prohibiting workplace discrimination, and when Plaintiff first reported Farsace's conduct in the summer of 2011, Tschetter ultimately told Plaintiff she would "handle it." According to Plaintiff, Farsace did not make additional discriminatory comments until May 2012. That month, Plaintiff reported to Human Resources, for the first time, the harassment she felt she had experienced at Unity. Defendant's HR department arranged a follow-up meeting with Plaintiff when she returned to work in June 2012. After that meeting, HR officials planned another meeting to address Plaintiff's concerns, but that meeting never occurred because Plaintiff took another medical leave and did not return to Unity. Because Defendant did all it could to address Plaintiff's complaints, it is not liable for any harassing behavior of its employees. Defendant's Motion for Summary Judgment is therefore GRANTED with respect to Plaintiff's hostile work environment claims.

## IV. Disparate Treatment Under the ADA

Plaintiff argues that Defendant discriminated against her based her disability in violation of the ADA. The ADA prohibits discrimination against qualified individuals "on the basis of

---

[11] In denying that Farscace's remarks created a hostile working environment, the Court is not endorsing Defendant's argument that Farsace was merely "asking questions about race" and "opin[ing] about another person's views on race" when she allegedly told Plaintiff "I thought blacks had hair like wool" and that her "husband would never have a black person come over to our house for dinner." Regardless of Farsace's intent in making these statements, Plaintiff reasonably perceived these remarks as offensive.

10

disability in regard to job application procedures, the hiring, advancement or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To establish a *prima facie* case under the ADA, the plaintiff must show that (1) her employer is subject to the ADA; (2) she is disabled within the meaning of the ADA; (3) she was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) she suffered an adverse employment action because of her disability. *Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 198 (2d Cir. 2004).

Plaintiff has satisfied the first two elements of this test, but she cannot show that she was otherwise qualified to perform the essential functions of her job or that she suffered an adverse employment action because of her disability. Regular and predictable attendance is "fundamental to most jobs, . . . and an employee who cannot get to work does not satisfy the essential requirements of her employment." *Ward v. Concentrix Corp.*, 14-CV-6392, 2016 WL 336030, *3 (W.D.N.Y. Jan. 28, 2016) (quoting *Shepheard v. City of N.Y.*, 577 F. Supp. 2d 669, 676 (S.D.N.Y. 2008)). The ADA does not "require employers to tolerate chronic absenteeism even when attendance problems are caused by an employee's disability." *Mescall v. Marra*, 49 F. Supp. 2d 365, 374 n.18 (S.D.N.Y. 1999).

Employee attendance is critical to Defendant and the patients it serves. Because Plaintiff often gave Defendant little to no advance notice of her absences, patients went unserved and Defendant had a difficult time scheduling future appointments. Plaintiff implies that her attendance was a "marginal" as opposed to essential job duty, *see* ECF No. 55 at 13, however, nothing could be more fundamental to a dental hygienist's work than the ability to meet with patients.

Plaintiff maintains that she would have been able to perform her job if Defendant granted the requested "reasonable accommodations" of having her work under a different supervisor and with different coworkers. *See* ECF No. 55 at 15. The ADA requires employers to make "reasonable accommodations for one who is disabled," such as "job restructuring, reassignment to a vacant position, . . . and other similar accommodations." *Wernick v. FRB*, 91 F.3d 379, 384 (2d Cir. 1996). According to the Second Circuit, however, reasonable accommodations do "not mean elimination of any of the job's essential functions." *Id.* Working under an assigned supervisor, like regular and predictable job attendance, is an essential job function. *See id.* (concluding that working under the assigned supervisor was an essential function of plaintiff's job, and declining to find in favor of plaintiff who complained that defendant employer failed to assign him to a different supervisor); *Kennedy v. Dresser Rand Co.*, 193 F.3d 120, 122-23 (2d Cir. 1999). Thus, the ADA did not require Defendant to grant Plaintiff's request to work at a different clinic, or to reassign Tschetter and Farsace, when there were no dental hygienist vacancies at Defendant's other locations.

Furthermore, an employer need not accommodate an employee if "the accommodation would impose an undue hardship on the operation of [the employer's business]" because such an accommodation would not be reasonable. *Id.* (quoting U.S.C. § 12112(b)(5)(A)). There is a presumption "that a request to change supervisors is unreasonable, and the burden of overcoming that presumption . . . lies with the plaintiff." *Id.* at 123. Defendant explained in its Motion how creating an entirely new dental hygienist position or reassigning Tschetter and Farsace would have strained its financial and organizational resources. Plaintiff failed to rebut Defendant's arguments in its reply, instead misconstruing the timeline of events in this case.

Moreover, contrary to Plaintiff's arguments that Defendant failed to accommodate her, the record shows that Defendant did all it could to reasonably accommodate her. Defendant held Plaintiff's position open for seven months despite the strain her indefinite absence put on her coworkers and Defendant's patients. The ADA did not require Defendant to hold Plaintiff's job open forever. *See Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 338 (2d Cir. 2000) ("The duty to make reasonable accommodations does not, of course, require an employer to hold an injured employee's position open indefinitely while the employee attempts to recover...."). Moreover, when Plaintiff indicated that she could return to work, Defendant tried to accommodate her request to work for a different supervisor by offering her a dental secretary position at another location, but Plaintiff refused that accommodation.[12]

Finally, as explained in Section II of this opinion, there is no evidence supporting Plaintiff's claim that Defendant acted with discriminatory intent. Plaintiff therefore cannot meet the third or fourth element of the ADA's *prima facie* test. Accordingly, Defendant's Motion for Summary Judgment is GRANTED with respect to Plaintiff's ADA disparate treatment claim.

## V. Retaliation Under Title VII, Section 1981, the ADA, and the NYSHRL

To establish a *prima facie* case of retaliation, a plaintiff must establish that (1) she participated in a protected activity known to the defendant; (2) she suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse action. *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002). Even after establishing a *prima facie* case, the plaintiff ultimately must show that retaliation was the "but-for" cause of the adverse

---

[12] Plaintiff failed to include a separate claim for failure to accommodate under the ADA, only raising it in her reply brief to Defendant's Motion for Summary Judgment. *See* ECF No. 55 at 21. The Court's analysis on the third element of her *prima facie* ADA discrimination case applies to any "failure to accommodate" claim that Plaintiff has.

13

action, and not just a "substantial" or "motivating" factor in the employer's decision. *Nassar*, 570 U.S. at 348.

Plaintiff cannot show any causal connection between her termination and her complaints about Farsace's racial comments—let alone can she demonstrate but-for causation. Plaintiff has not adduced any evidence supporting her bald assertion that Defendant terminated her because she complained to HR about Farsace's racial comments. Defendant did not terminate Plaintiff until eight months after she reported Farsace to HR and, as discussed earlier in this opinion, HR tried to further discuss and resolve Plaintiff's complaints, but could not because Plaintiff took another leave of absence. As explained in Section II of this opinion, the only reasonable conclusion to draw from the record is that Defendant terminated Plaintiff's employment because she refused the only available position offered to her.

This same analysis applies to Plaintiff's ADA retaliation claim. Plaintiff's protected activity under the EEOC "included requesting accommodations for her disabilities and good faith opposition of discrimination." ECF No. 55 at 19. As with her race-based retaliation claim, there is simply nothing in the record from which a jury could conclude that Defendant fired her for undertaking protected activity under the ADA. Accordingly, Defendant's Motion for Summary Judgment is GRANTED with respect to Plaintiff's retaliation claims.

## CONCLUSION

Defendant's Motion for Summary Judgment (ECF No. 50) is GRANTED and this case is DISMISSED. The Clerk of the Court is directed to close this case.

IT IS SO ORDERED.

Dated: March 19, 2018
       Rochester, New York

                                          HON. FRANK P. GERACI, JR.
                                          Chief Judge
                                          United States District Court